UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
PETER SCHIFF,                                                      :
                                                                   :
                    Petitioner,                                  :
                                                                   :   25 Civ. 6426
                    - against -                                  :
                                                                   :
QENTA INC., RESPONSIBLE GOLD TRADING DMCC, :
and G-COMMERCE DMCC,                                               :
                                                                   :
                    Respondents.                                 :
------------------------------------------------------------------ x

## DECLARATION OF BRENT DE JONG

Pursuant to 28 U.S.C. § 1746, I, Brent de Jong, hereby declare as follows:

1. My name is Brent de Jong. I make this Declaration on personal knowledge and in support of Respondents' requests (1) to dissolve the temporary restraining order imposed by the state court, (2) deny the preliminary injunction sought by Petitioner, and (3) dismiss this action.

2. I am the founder and principal of Respondent Qenta Inc. ("Qenta"). Qenta is a technology company that offers products such as payment solutions for merchants, virtual cards, and digital wallets.

3. Qenta is a Delaware corporation with its principal place of business in Texas. Qenta is the owner of Emergent Technology Ltd., a Cayman Islands entity with its principal place of business in Texas that is in turn the owner of Respondents Responsible Gold Trading DMCC ("RGT") and G-Commerce DMCC ("G-Commerce"). RGT and G-Commerce are free zone companies with their principal place of business in Dubai and incorporated under the laws of the United Arab Emirates.

4. I understand that Petitioner Peter Schiff is the founder and sole shareholder of Euro Pacific International Bank, Inc. ("EPB"). EPB is a Puerto Rican International Financial Entity.

5. By 2022, EPB was undercapitalized and losing money. I understand that on June 30, 2022, EPB was placed into liquidation proceedings under the auspices of a Trustee and ultimately the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF" by its Spanish initials).

6. Under the oversight of the Trustee, a process was designed whereby EPB customers were given a choice between receiving cash from the official liquidation process being run by the Trustee ("opt-out" customers) or transferring their claims to Qenta and becoming invested in Qenta's products ("opt-in" customers). Among other products, under a trading license granted to RGT by the Dubai Multi Commodities Centre ("DMCC") in the United Arab Emirates, Qenta offers exposure to responsibly-sourced gold and other precious metals, and therefore the potential to "opt-in" was attractive to some customers, many of whom we understand had invested with Schiff in the first place because of his public prominence as a "gold bug."

7. However, customers that did not want to cast their lot with Qenta and wished to receive only cash could "opt out" and make claims in the liquidation process being overseen by the Trustee. At any point until a cut-off date (still to be determined by Respondents and the Trustee) before the final migration, any customer who initially chose to "opt-in" could change their status and become an "opt-out" customer.

8. On September 30, 2022, Respondents, EPB, and Petitioner entered into a Purchase and Assumption Agreement ("Agreement"), a true and correct copy of which is attached hereto as **Exhibit 1**. Under the Agreement, Respondents agreed to purchase, free and clear, EPB assets (mainly cash, metals, and some securities) in an amount equal to the opt-in liabilities. EPB was responsible for transferring title to the assets and liabilities.

9. Under the Agreement, Qenta also acquired certain subsidiaries of EPB.

10. The migration process contemplated by the Agreement to this day has not been completed. The Agreement provided for the possibility of more than one "closing," with final closing, understood as the migration of opt-in customer claims and the corresponding assets and liabilities, yet to occur.

11. The migration of the "opt-in" customers from EPB to Respondents, and associated reconciliation, has proven to be complex and difficult – far more so than anyone foresaw at the time of the Agreement.

12. To the best of our understanding, EPB's assets were never segregated by customer, e.g. through "FBO" (for the benefit of) accounts with its counterparties/custodians.

13. Following execution of the Agreement, Respondents were given control of some EPB assets (some cash in accounts held by the acquired subsidiaries but mainly precious metals and mutual funds, asset classes that the Trustee had stated he was unable to manage), but Respondents were never given custody of sufficient assets to cover the liabilities of the "opt-in" customers. This mismatch, and the need to work through it, has delayed the migration of the customers and their associated liabilities to Qenta's platform.

14. Another source of difficulty was that third-party custodians of EPB's assets delayed their release. Novo Banco, S.A. ("Novo"), a Portuguese correspondent bank that held a majority of EPB's foreign currency (FX), took more than a year to return the assets to the Trustee (converting all FX into U.S. Dollars). Once that happened, reconciliations had to be adjusted and further interaction with Novo was required to understand the exchange rates they had used.

15. Respondents have worked with the Trustee for nearly three years to reconcile customer claim amounts and facilitate the EPB liquidation and migration of opt-in customer claims to Qenta. Respondents additionally hired several former employees of EPB to assist with

responding to requests from regulators, as well as to support the Trustee in the termination of some of EPB's vendor contracts. Nevertheless, there have been a series of disagreements surrounding the reconciliation of assets and liabilities. There is, however, no dispute between the Trustee and Respondents that, for purposes of the reconciliation, customer claims (liabilities of EPB) should be valued as of September 2022 when the liquidation process began.

16. With the migration process seemingly broken beyond repair, on July 11, 2025, Respondents sent a letter to the Trustee ("Termination Letter") seeking to terminate the Agreement and return to the Trustee all EPB assets less certain amounts intended to make Respondents whole for amounts expended, work done, and costs incurred. A copy of the Termination Letter is attached hereto as **Exhibit 2.**

17. The Trustee rejected the Termination Letter. The Trustee's response, dated July 25, 2025 ("Trustee Response Letter"), is attached hereto as **Exhibit 3**. In it, the Trustee stated that Respondents "cannot liquidate or otherwise dispose of such assets except strictly in accordance with instructions from the underlying customers and any applicable regulatory directives." The Trustee further stated that: "no liquidation, transfer, or return of such assets or their value shall be undertaken without the written, individualized direction from each relevant customer."

18. The Trustee additionally referred to Respondents' "announced intent to cancel Qenta's acquisition of the different subsidiaries once owned by EPB." The Trustee appears to have misunderstood the Termination Letter. Respondents made no such announcement and have not proposed to unwind their acquisition of the subsidiaries. On the contrary, the Respondents' proposal to the Trustee was to retain ownership of the subsidiaries with the ultimate purpose of facilitating the EPB liquidation.

19. Also on July 25, 2025, Schiff emailed me a letter, a true and correct copy of which is attached hereto as **Exhibit 4**, titled "Demand for Return of Customer Assets Held by Qenta Inc." Schiff's letter stated that he "acknowledged and accepted your termination of the [Agreement]" but that he "respectfully disagree[d] with the Receiver's position that Qenta should retain custody of those assets." Instead, Schiff "demanded the immediate return of all customer assets to EPB for safekeeping as part of the ongoing liquidation process."

20. Schiff, therefore, who according to my understanding has no authority in the liquidation process, seems to be disagreeing with the Trustee about the actions Qenta should or should not take to facilitate the liquidation process. Schiff wants EPB assets corresponding to "opt-in" customer claims returned to the Trustee; the Trustee is telling us to keep those assets (and the liabilities).

21. In all events, the current status of this matter is that Qenta and the Trustee are still in the process of working through asset and liability reconciliation for the "opt-in" customers. Among other solutions, Qenta is trying to offer gold-based products and / or buy-outs to ensure that the "opt-in" customers receive value for their claims.

22. The temporary restraining order ("TRO") entered by the state court on August 1, 2025 at Schiff's behest is hindering progress on these solutions. For instance, Respondents have reached agreement with one customer on the terms of a buy-out – but because of the breadth of the TRO, Respondents are unsure whether they can consummate this transaction.

23. I have reviewed Schiff's affirmation dated July 28, 2025 submitted in the state court in support of his request for a temporary restraining order ("Schiff Aff."). A copy of this affirmation, without its exhibits, is attached hereto as **Exhibit 5**.

24. Schiff alleges (Ex. 5, paragraph 22) under the rubric of "Operational Concerns" that "Qenta removed its management page from its website." Schiff's suggestion that this is somehow an "operational concern" is misplaced. Qenta is currently in the midst of a planned reorganization and rebranding (in no way related to the Agreement or EPB). That includes the adoption of the "Qecosystem" concept (signifying interconnected products) and the use of a new website and email domain (qecosystem.com). Qenta is redesigning its website to reflect its new internal organization, staff, and roles. This has nothing at all to do with EPB.

25. Schiff additionally alleges that "Qenta failed to pay maintenance fees for EPB's website, resulting in an outage that caused significant concern among customers, . . . Ultimately, Qenta paid the outstanding fees, and website access was restored three days later." Ex. 5, paragraph 23.

26. This, too, does not qualify as an "operational concern." The Agreement contemplated that Qenta would be allowed to use the EPB domain (europacbank.com) for a period of time in order to keep EPB customers informed of the migration to Qenta. *See* Ex. 1 § 2.2(f). As communication between Qenta and the Trustee broke down at the beginning of 2025, Qenta stopped posting on the web site, as there was no new information to report. That led to Qenta's card on file with the web hosting vendor to expire and the web site going down.

27. After learning of the web site situation from Schiff, Qenta promptly made the outstanding payment ($122.59) and the web site was re-established. This caused no prejudice to EPB, EPB customers, Schiff, or anyone else.

28. Schiff next (Ex. 5, paragraph 24) criticizes Qenta's proposal for how to reconcile assets and liabilities, stating among other things that to return assets at their September 2022 value would confer an "unearned windfall" at the expense of customers. What transpired here is that the

Trustee stated to Respondents that, in his role as a bank liquidator, he was not responsible for any movements in the value of non-U.S. dollar-denominated assets (including FX and precious metals) from their September 2022 values.

29.     In other words, Qenta, which was facing fixed liabilities (the value of opt-in customer claims, denominated in dollars as of September 2022), was exposed to the movements in any assets relative to the U.S. dollar over a three-year period. Qenta was forced to assume both the risk and the reward of such fluctuations.

30.     Schiff additionally alleges (Ex. 5, paragraph 25) that "Qenta has not paid storage fees for EPB's silver since February 2024." When EPB was in operation, it charged its customers periodically for storage fees associated with owning silver with the Silver Bullion firm in Singapore. Respondents could not do that (customers had not yet been migrated to Respondents) and so asked the Trustee to pay the storage fees. The Trustee refused and so EPB asked Silver Bullion to sell some of the silver holdings to help pay for storage fees. However, silver is not especially liquid, silver sales have not been completed, and so some storage bills have gone unpaid. Schiff's (to our understanding unauthorized) interference in this process has not helped matters.

31.     Schiff also alleges that Qenta "transferred out the gold assets" from the Silver Bullion account by "convert[ing] EPB's gold into 'paper gold' stored in Switzerland without legal title." *Id*. I am unsure what Schiff means here by "without legal title," but what actually happened is that, in order to be ready to on-board the "opt-in" customers, Qenta sold the gold bullion in the Silver Bullion account and invested it in a combination of gold bullion in Switzerland meeting Qenta's trademarked Responsible Gold standard for sourcing gold (the only type of gold bullion Qenta works with) and derivatives on gold held through a commodities brokerage account.

32.  Schiff states (Ex. 5, paragraph 26) that G-Commerce allowed its Dubai license to expire and "is winding down." The first part of this statement is inaccurate and the second is irrelevant. G-Commerce was established to hold a second precious metals trading license for the corporate group in addition to that held by RGT. This turned out to be unnecessary – RGT can equally serve EPB's opt-in customers – and G-Commerce withdrew its license application to the DMCC and is in the process of being wound down. This has no bearing whatsoever on the Agreement or the transactions thereunder. Although Schiff states that G-Commerce is Qenta's "Dubai-based entity handling customer on-boarding" (*id.*), RGT still holds its license and can on-board customers the same as G-Commerce would have. For that matter, Qenta could also on-board customers and use RGT to hold precious metals under an intra-group agreement.

33.  Schiff additionally asserts that a former Swiss affiliate of Qenta named G Mint Sàrl ("G Mint") "entered bankruptcy in 2024 and was removed from the Swiss commercial registry." (Ex. 5, paragraph 26). The first part of this is wrong and the second part is irrelevant. The liquidation of G Mint was not because of bankruptcy (Schiff supplies no evidence of bankruptcy) but for statutory reasons having to do with the loss of a resident director. And the liquidation of G Mint does not impact Respondents or EPB customers. Contrary to Schiff's description of G Mint as Qenta's "Swiss gold custody affiliate," G Mint has nothing to do with the relevant gold bullion that Qenta holds in Switzerland today.

34.  Schiff's affirmation refers to an unrelated dispute pending in New York state court between Offshore Exploration and Production LLC ("OEP") and Respondents' parent De Jong Capital LLC ("DJC"). I understand that the state court has dismissed many of OEP's claims and that the theoretical maximum damages that OEP could recover in that case are now capped at $270,000 (of which $200,000 is the maximum allowable punitive damages under Texas

law). DJC denies all liability in the litigation with OEP. However, even in an extreme scenario in which OEP were to somehow prevail on all of its remaining claims and recover the theoretical maximum damages, a hypothetical judgment against DJC of $270,000, including $200,000 in punitive damages, would have no material impact on DJC's financial condition nor would it impact the financial condition of Respondents.

I declare under penalty of perjury that the foregoing is true and correct.

Date: August 12, 2025

_____
Brent de Jong