UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETER SCHIFF,

                Petitioner,

        -against-

QENTA INC., RESPONSIBLE GOLD TRADING DMCC,
and G-COMMERCE DMCC

                Respondents

25 Civ. 6426 (PKC)


**MEMORANDUM OF LAW IN SUPPORT OF RESPONDENTS' MOTION TO DISSOLVE THE *EX PARTE* TEMPORARY RESTRAINING ORDER AND DISMISS THE PETITION**


Daniel R. Walfish
Elan R. Dobbs
KATSKY KORINS LLP
605 Third Avenue
New York, New York 10158
(212) 953-6000
dwalfish@katskykorins.com

*Attorneys for Respondents Qenta Inc., Responsible Gold Trading DMCC, and G-Commerce, DMCC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES _____ ii

PRELIMINARY STATEMENT _____ 1

FACTS _____ 4

      A.    EPB Is Placed Into Liquidation Proceedings Because Of Mismanagement by Schiff _____ 4

      B.    Qenta Agrees To Assume Some of the Assets and Liabilities of the Failed EPB But the Migration Runs Into Headwinds _____ 5

      C.    Qenta Seeks To Terminate the Agreement _____ 7

      D.    Schiff Obtains an Ex Parte TRO in State Court _____ 8

      E.    The TRO Is Hindering Progress on a Resolution _____ 10

ARGUMENT _____ 11

I.    THE TRO WAS IMPROPERLY ISSUED AND SHOULD BE IMMEDIATELY DISSOLVED _____ 11

      A.    Schiff Did Not Demonstrate That He Would Suffer Immediate, Irreparable Harm in the Absence of a TRO _____ 11

      B.    The TRO Suffers From Additional Fatal Flaws Requiring Its Dissolution ____ 14

II.    SCHIFF'S REQUEST FOR AN INJUNCTION IN AID OF ARBITRATION SHOULD BE DENIED AND THIS PROCEEDING SHOULD BE DISMISSED _____ 16

      A.    Schiff Cannot Establish Irreparable Harm in the Absence of An Injunction ___ 17

      B.    Schiff is Not Likely To Succeed on the Merits of His Arbitration Claims_____ 17

      C.    The Balance of Equities Does Not Favor Schiff_____ 19

      D.    Schiff Has Not Satisfied CPLR § 7502(c)'s Required Showing that an Arbitral Award Would Be Rendered Ineffectual in the Absence of an Injunction _____ 20

CONCLUSION_____ 20

# TABLE OF AUTHORITIES

**Page**

*Cases*

*BMaddox Enters. LLC v. Oskouie*, 2017 WL 9534738 (S.D.N.Y. Sept. 8, 2017),
   *R&R adopted*, 2017 WL 4797906 (S.D.N.Y. Oct. 23, 2017) .......................... 11

*City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114 (2d Cir. 2011) ................ 15

*Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156 (2d Cir. 2004) ........................ 15

*D'Arrigo Bros Co. of N.Y., Inc. v. Gramercy Produce Inc.*, 2024 WL 3329787
   (S.D.N.Y. June 26, 2024) .......................... 14

*Discover Growth Fund v. 6D Glob. Techs. Inc.*, 2015 WL 6619971
   (S.D.N.Y. Oct. 30, 2015) .......................... 17

*Expedia, Inc. v. United Airlines, Inc.*, 2019 WL 1499269 (S.D.N.Y. Apr. 5, 2019) .......... 11, 12

*Forest City Daly Housing, Inc. v. Town of N. Hempstead*, 175 F.3d 144 (2d Cir. 1999) ...... 12

*Hill v. Reynolds*, 187 A.D.2d 299 (1st Dep't 1992) .......................... 19

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592 (S.D.N.Y. 2014) ........ 19

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .......................... 16

*N.Y. State Nat'l Org. for Women v. Ter*ry, 697 F. Supp. 1324 (S.D.N.Y. 1988) ............ 15

*Oscar Produce Inc. v. Jucedaro LLC*, 2025 WL 358932 (E.D.N.Y. Jan. 31, 2025) ........... 14

*Petrello v. White,* 533 F.3d 110 (2d Cir. 2008) .......................... 15

*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904 (2d Cir. 1990) .................. 11

*Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999) ................. 11

*SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79 (2d Cir. 2000) .......................... 16, 20

*Shubin v. Slate Digital, Inc.*, 2022 WL 168152 (S.D.N.Y. Jan. 19, 2022) ................ 20

*Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs. for Femit Tr. 2006-FF6*,
   368 F. Supp. 3d 723 (S.D.N.Y. 2019) .......................... 17

*UGX Brands, LLC v. City of Norfolk*, 2025 WL 2083797 (S.D.N.Y. July 24, 2025) _____ 13

***Statutes and Rules***

22 N.Y.C.R.R. § 202.70 _____ 14

CPLR § 6313(c) _____ 15

CPLR § 7502_____ passim

Fed. R. Civ. P. 65_____ passim

Respondents Qenta Inc. ("Qenta"), Responsible Gold Trading DMCC ("RGT"), and G-Commerce DMCC ("G-Commerce," and collectively with Qenta and RGT, "Respondents") submit this memorandum of law in support of their motion (i) to dissolve, pursuant to Rule 65(b)(4) of the Federal Rules of Civil Procedure ("Rules"), the temporary restraining order imposed by Supreme Court, Westchester County prior to the removal of this action; (ii) deny the injunction in aid of arbitration sought by Petitioner Peter Schiff ("Schiff" or "Petitioner") pursuant to CPLR § 7502 (c); and (iii) upon such denial, dismiss this proceeding.

## PRELIMINARY STATEMENT[1]

Respondents move by Order to Show Cause to lift an *ex parte* temporary restraining order ("TRO") improvidently issued by Supreme Court, Westchester County without notice to Respondents. Neither Petitioner nor the state court have explained what immediate harm and severe prejudice justified the imposition of such a drastic restraint without notice to Respondents and indeed there was none. State court did not observe any of the safeguards and rules barring the issuance of provisional relief under New York law, and the TRO it granted – which, following the removal of this action here, it is now this Court's province to enforce – violates Rule 65 in virtually every respect. To correct this abuse of Respondents' due process rights, Respondents invoke Rule 65(b)(4), which permits them "[o]n 2 days' notice to the party who obtained the order without notice" to "appear and move to dissolve or modify the order." For the reasons that follow – reasons Respondents were denied the opportunity to present in the first instance – the TRO should be immediately dissolved. This is the first order of business.

---

[1] Exhibits cited using a letter designation are to the accompanying Declaration of Daniel Walfish. Exhibits cited using a number designation are to the accompanying Declaration of Brent de Jong. Documents filed on ECF are cited using the pagination in the ECF header, not a document's internal pagination, if different. Unless otherwise specified, all emphasis is added and all citations and internal quotation marks are omitted.

In the second prong of this motion, respondents move in the ordinary course to deny the injunction in aid of arbitration Schiff seeks pursuant to CPLR § 7502(c) and upon such denial, to dismiss this proceeding.

The background, explained in detail below, is as follows. Schiff started a financial institution called Euro Pacific International Bank, Inc. ("EPB"), which is located in Puerto Rico and of which he is the sole shareholder. An investigation conducted by Puerto Rican financial authorities disclosed significant mismanagement and regulatory violations and after an initial consent order failed to rectify these problems, in 2022, the authorities ordered EPB to cease operations and commence liquidation proceedings under the aegis of a trustee ("Trustee"). The Trustee took control of EPB in June 2022 and since that time has sole authority to liquidate EPB's assets and oversee its winddown.

In connection with the liquidation of EPB, Respondents entered into an agreement to purchase some of EPB's assets and subsidiaries. Pursuant to the agreement, EPB's customers could choose to receive cash from the liquidation overseen by the Trustee or to "opt-in" to become customers of Respondent Qenta, in which case their claims would be migrated to Qenta and they would receive digital assets offered by Qenta. Respondents thereafter began working with the Trustee to implement these transactions, which resulted in a "liquidation plan" to be overseen by the Trustee. That process is complex and remains incomplete. Earlier in 2025, communications between Respondents and the Trustee broke down and in July 2025, Respondents sought to terminate the agreement with EPB. The Trustee rejected this effort and the parties – Respondents and the Trustee – are still negotiating a resolution. Inasmuch as Schiff has no authority over EPB's assets due to his ouster from control of EPB in 2022, none of this is Schiff's affair.

Notwithstanding his lack of authority to act on EPB's behalf respecting the liquidation of its assets, on July 29, 2025, Schiff commenced a special proceeding in Supreme Court, Westchester County (a venue that has no connection to the parties or the facts of this dispute) seeking an injunction in aid of an arbitration he purports to bring on EPB's behalf without the imprimatur of the Trustee. Without giving Respondents any opportunity to be heard or any advance notice, Schiff obtained a TRO restraining Respondents from doing anything with EPB-related assets in its possession. He then noticed an arbitration in the International Chamber of Commerce, in which he disclosed his intention to seek an arbitral award directing Respondents to return all of EPB's assets in their possession to the Trustee (even though the Trustee has repeatedly stated that he does not want this to happen), for an accounting, and damages for unjust enrichment. Respondents removed the special proceeding to this Court and now seek relief.

The TRO should be dissolved forthwith. Schiff did not show, and cannot show, any immediate, irreparable harm *at all*, let alone harm to *him*, in the absence of draconian provisional relief. He had the heavy burden to make a clear showing of such harm and failed abjectly, adducing rank speculation and irrelevances in place of evidence. This, alone, requires dissolution of the TRO. (Point I.A). The order suffers from a number of additional fatal flaws—it is vague as to the assets and activities that are restrained, and it does not comply with *any* of the provisions of Fed. R. Civ. P. 65 designed to protect the interests of parties enjoined without notice. (Point I.B).

The same reasons that require dissolution of the TRO mandate the dismissal of this proceeding. Schiff simply cannot meet any of the prerequisites necessary to obtain provisional relief in aid of arbitration. The lack of any immediate, irreparable harm to Schiff is dispositive in this regard. (Point II.A). Even if it were not, however, Schiff has not established that he can even bring an arbitration in the first place—far less that he is likely to succeed on the claims he now

purports to bring. In fact, the principal relief Schiff purports to seek in arbitration is the *opposite* of what the Trustee in charge of EPB's assets wants. (Point II.B). The balance of the equities favors Respondents, not Schiff (Point II.C), and Schiff cannot separately satisfy CPLR § 7502(c)'s requirement that in the absence of an injunction, an arbitral award would be rendered ineffectual. (Point II.D).

## FACTS

### A.  EPB Is Placed Into Liquidation Proceedings Because Of Mismanagement by Schiff

EPB is a Puerto Rican International Financial Entity founded by Petitioner Peter Schiff, who is currently its sole share-holder. Schiff badly mis-managed EPB for a number of years.

In 2020-2021, Puerto Rico's Office of the Commissioner of Financial Institutions (in Spanish, Oficina del Comisionado de Instituciones Financieras, or "OCIF") conducted an examination of EPB following which OCIF issued a Consent Order on October 28, 2021 ("2021 Consent Order"). Ex. A. The 2021 Consent Order found that EPB's "earnings are critically deficient due to continued losses negatively impacting capital that is at a critically deficient level," and that "[m]anagement performance, operations, and risk management practices are critically deficient due to financial results, significant weaknesses in the internal controls and procedures, inaccurate accounting records," lack of compliance with the International Financial Center Regulatory Act (the "Act") and its regulations, and "inadequate Bank Secrecy Act compliance program." *Id.* at 1-2.

The internal reforms required by the 2021 Consent Order did not work, and in June of 2022, "due to a non-compliance with the minimum regulatory capitalization requirements set forth under [the Act]," OCIF placed EPB in liquidation proceedings, suspended EPB's banking activities, and "designat[ed] a Trustee-Receiver to take over the administration of [EPB] and effectively manage the liquidation process." Ex. B at 2 (August 9, 2022 Consent Order for

Liquidation and Dissolution of International Financial Entity (the "Liquidation Order")); De Jong Decl. ¶ 5.

The Liquidation Order stated that, as of the Effective Date (August 9, 2022), "the Trustee, on behalf of Euro Pacific, shall have the authority to either dispose or sell and liquidate its assets and engage in such other transactions as maybe [sic] appropriate to its dissolution and liquidation." Ex. B at 7. The Liquidation Order further provided that "[t]he Trustee shall be in charge of completing the liquidation [of] [EPB] to the best of his ability . . . in the event that [EPB] is unable to complete the Voluntary Liquidation Plan during the Liquidation Period" (*id*. at 7), which is not to exceed 90 days from the August 9, 2022 effective date (*id*. at 4). The Liquidation Order was issued on consent and EPB expressly admitted the facts in it. *Id*. at 12.

On September 6, 2022, Wigberto Lugo Mender (the Trustee appointed by OCIF), OCIF's Commissioner, and Petitioner signed a Liquidation and Dissolution Plan for EPB ("Liquidation Plan"). Ex. C. The Plan stated: "EPB ceased operations on June 30th, 2022, and the Trustee took possession of [EPB]." Ex. C at 5. The Liquidation Plan noted that Respondents had "agreed to assume/buy all the bank's deposit obligations of both cash and precious metals" and had "agreed to buy all issued and outstanding shares of" a set of EPB subsidiaries as well as to assume certain contracts with service providers for EPB. *Id*. at 3-4. The Liquidation Plan provided that customers could choose not to have their accounts transferred to G-Commerce. *Id*. at 4 n.1.

**B. Qenta Agrees To Assume Some of the Assets and Liabilities of the Failed EPB But the Migration Runs Into Headwinds**

Qenta is a technology firm that offers payment solutions for merchants, virtual cards, and digital wallets. De Jong Decl. ¶ 2 Under the oversight of the Trustee, a process was designed whereby EPB customers were given a choice between receiving cash from the official liquidation process being run by the Trustee ("opt-out" customers) or transferring their claims to Qenta and

becoming invested in Qenta's products ("opt-in" customers). *Id.* ¶ 6. Qenta offers exposure to responsibly-sourced gold and other precious metals, and therefore the potential to "opt-in" was attractive to some customers, many of whom likely invested with Schiff in the first place because of his public prominence as a "gold bug." *Id.*

However, customers that did not want to cast their lot with Qenta and wished to receive only cash could "opt out" and make claims in the liquidation process being overseen by the Trustee. At any point until a still-to-be-determined cut-off date before the final migration, any customer who initially chose to "opt in" could change their status and become an "opt-out" customer. *Id.* ¶ 7.

On September 30, 2022, Respondents, EPB, and Petitioner entered into a Purchase and Assumption Agreement ("Agreement" or "PAA"). Under the Agreement, Respondents agreed to purchase, free and clear, EPB assets (mainly cash, metals, and some securities) in an amount equal to the opt-in liabilities. Ex. 1 (PAA) § 1.1 (definitions of Assets, Eligible Customers, and Liabilities). EPB was responsible for transferring title to the assets and liabilities. *Id.* § 2.1(a). Under the Agreement, Qenta also acquired certain subsidiaries of EPB. *Id.* § 2.2(b).

The migration process contemplated by the Agreement to this day has not been completed. The Agreement contemplated more than one "Closing," with the final closing, wherein all opt-in claims and the corresponding assets transfer (*see id.* §§ 1.1 (definition of "Closing"), 2.2(d), 2.3), yet to occur. De Jong Decl. ¶ 10.

Following execution of the Agreement, Respondents were given control of some EPB assets, but the assets were insufficient to cover the liabilities of the "opt-in" customers. *Id.* ¶ 13. This mismatch, and the need to work through it, has delayed the migration of the customers and

their associated liabilities to Qenta's platform. *Id*. ¶¶ 11, 13. Another source of difficulty was that third-party custodians of EPB's assets delayed their release. *Id*. ¶ 14.

Respondents worked with the Trustee for nearly three years to reconcile customer claim amounts and facilitate the migration. *Id*. ¶ 15. Nevertheless, there have been a series of disagreements surrounding the reconciliation of assets and liabilities. *Id*. There is, however, no dispute between the Trustee and Respondents that, for purposes of the reconciliation, customer claims (liabilities of EPB) should be valued as of September 2022 when the liquidation process began. *Id*.

### C.  Qenta Seeks To Terminate the Agreement

With the migration process seemingly broken beyond repair, on July 11, 2025, Respondents sent a letter to the Trustee ("Termination Letter") seeking to terminate the Agreement and return to the Trustee all EPB assets less certain amounts intended to make Respondents whole for amounts expended, work done, and costs incurred. De Jong Decl. ¶ 16 & Ex. 2.

The Trustee rejected the Termination Letter. The Trustee's July 25, 2025 response stated that Respondents "cannot liquidate or otherwise dispose of such assets except strictly in accordance with instructions from the underlying customers and any applicable regulatory directives." Ex. 3. The Trustee further stated that: "no liquidation, transfer, or return of such assets or their value shall be undertaken without the written, individualized direction from each relevant customer." *Id*.

Also on July 25, 2025, Schiff sent Qenta a letter stating that he "acknowledged and accepted your termination of the [Agreement]" but that he "respectfully disagree[d] with the Receiver's position that Qenta should retain custody of those assets." Ex. 4. Instead, Schiff "demanded the immediate return of all customer assets to EPB for safekeeping as part of the ongoing liquidation process." *Id*.

Schiff, therefore, who according to Respondents' understanding has no authority in the liquidation process, seems to disagree with the Trustee about the actions Respondents should or should not take to facilitate the liquidation process. De Jong Decl. ¶ 20. Schiff wants EPB assets corresponding to "opt-in" customer claims returned to the Trustee; the Trustee is telling Respondents to keep those assets (and the liabilities). *Id.*

### D. Schiff Obtains an Ex Parte TRO in State Court

On July 30, 2025, Schiff invoked the arbitration clause in the PAA (Ex. 1 § 8.7) and commenced an arbitration with the International Chamber of Commerce. Ex. D at 2. Schiff's summary filing requested that the arbitration be seated in New York, New York and flagged that Schiff is seeking, as underlying relief in the arbitration, "immediate return of all retained assets" (relief that, as noted above, the Trustee himself opposes), an accounting, and "damages for unjust enrichment, breach of contract, and related harms." Ex. D at 3.

The day before, July 29, 2025, Schiff commenced a special proceeding pursuant to CPLR § 7502 with the New York Supreme Court in Westchester County (the "State Court") by filing a petition and a proposed order to show cause ("OSC") containing a TRO (the "State Court Action"). Walfish Decl. ¶ 7; Dkt. 1-1 at 2-5. The State Court Action was assigned Index Number 67774/2025. Walfish Decl. ¶ 7; Dkt. 1-1 at 2-5.[2]

---

[2] There was no basis at all for filing the proceeding in Westchester County and Schiff did not even seriously try to identify one, instead referring to the purported presence of an affiliated business (but not EPB and not himself) in Westchester. Ex. 5 (Schiff Aff.) ¶ 33; Dkt. 1-1 at 2. Because the Agreement provides for arbitration in New York City (Ex. 1 § 8.7) and Petitioner has named New York, New York as the seat of arbitration, the proceeding should have been filed in New York County. *See* CPLR §§ 7502(a)(i) ("the proceeding shall be brought in *the court and county specified in the agreement [to arbitrate]*"), 7502(c) (conferring jurisdiction on "[t]he supreme court *in the county in which an arbitration is pending or in a county specified in subdivision (a) of this section*").

Petitioner gave no advance notice that he was planning to file the proposed OSC or seek a TRO. Walfish Decl. ¶ 8. Instead, Petitioner's counsel Peter Chema sent Qenta's counsel – who had not yet been retained to appear for Qenta in this action and who has never met or spoken with Peter Chema – a series of informal emails on July 30 and 31 *after* the State Court Action and proposed OSC/TRO were on file. *Id*. ¶ 9.

At some point on Friday, August 1, 2025 – still before Qenta's counsel was retained to appear and before Qenta had made any appearance – the state court, *ex parte*, signed the OSC and granted the TRO sought by Petitioner. Walfish Decl. ¶ 10; Ex. E. The TRO was uploaded to the state court docket at 4:40 p.m. that afternoon. Ex. F. The OSC called for an appearance on Wednesday, August 6 at 10 a.m. Ex. E.

The TRO restrained Respondents until further notice "from selling, transferring, encumbering [sic] dissipating, or disposing of any EPB Assets, including approximately $50 million in precious metals, $19 million in cash, mutual funds, Subsidiary Shares, and Assumed Contracts" and indefinitely prohibited Respondents "from destroying, concealing, ***or altering*** any documents or records related to said Assets" – relief so broad it would seem to prevent ordinary-course record-keeping updates and corrections. Ex. E at 2. The State Court ordered that service of the OSC be made on (still unretained) counsel "by overnight mail and email" no later than August 2, 2025 (a Saturday). *Id*.

Petitioner did not provide any notice that the OSC had been signed and the TRO had been entered on the day it was signed (August 1, 2025). Walfish Decl. ¶ 13. Instead, the next day, Saturday, August 2, 2025, at or about 6:29 p.m. – nearly 26 hours after the TRO was uploaded to the State Court's docket – Petitioner emailed the TRO to Respondents' counsel, who did not

receive any word of this email (which was initially blocked by spam filters) until Sunday, August 3. *Id.* ¶¶ 14, 16; Exs. G, H.

And, Petitioner chose simply to disregard the provision of the state court order requiring service by overnight mail on or before August 2, 2025. Instead, on Monday August 4 (two days after the court-ordered deadline), Petitioner sent out, for some reason from Michigan, a USPS Priority Mail (not FedEx Priority Overnight mail) package that was not received in counsel's offices until Friday, August 8, 2025 – a full week after entry of the TRO. Walfish Decl. ¶ 15. Petitioner's counsel nevertheless falsely certified to the state court under penalty of perjury that he had transmitted the papers via "FedEx Priority Overnight," *Id.* ¶ 15 & Exs. I, J.

On Tuesday, August 5, 2025, Respondents finalized retention of counsel for this matter (Walfish Decl. ¶ 18) and removed the State Court Action to this Court on the basis of diversity jurisdiction. Dkts. 1, 5.

### E.  The TRO Is Hindering Progress on a Resolution

Qenta and the Trustee are still in the process of working through asset and liability reconciliation for the "opt-in" customers. De Jong Decl. ¶ 21. Among other solutions, Qenta is trying to offer gold-based products and / or buy-outs to ensure that the "opt-in" customers receive value for their claims. *Id.* ¶¶ 21, 22. The temporary restraining order ("TRO") entered by the state court is hindering progress on these solutions. For instance, Respondents have reached agreement with one customer on the terms of a buy-out – but because of the breadth of the TRO, Respondents are unsure whether they can consummate this transaction. *Id.* ¶ 22.

## ARGUMENT

## I.    THE TRO WAS IMPROPERLY ISSUED AND SHOULD BE IMMEDIATELY DISSOLVED

### A.  Schiff Did Not Demonstrate That He Would Suffer Immediate, Irreparable Harm in the Absence of a TRO

A TRO is an extraordinary remedy, all the more so when imposed ex parte. This one needs to be dissolved for the primary reason that Schiff did not, and cannot, establish the "sine qua non" of entitlement to such relief: immediate and irreparable harm in the absence of a provisional remedy. *BMaddox Enters. LLC v. Oskouie*, 2017 WL 9534738, at *3 (S.D.N.Y. Sept. 8, 2017) (gathering authorities), *R&R adopted*, 2017 WL 4797906 (S.D.N.Y. Oct. 23, 2017). Schiff was required to make this showing "before the other requirements [] are considered" (*id.*) and as a result, if the Court determines that Schiff did not meet his burden of demonstrating irreparable harm, "it is not necessary to consider whether [Schiff] has demonstrated a likelihood of success on the merits, whether the balance of hardships is in its favor or whether the relief is in the public interest." *Id.* at *6 (*citing Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *accord Expedia, Inc. v. United Airlines, Inc.*, 2019 WL 1499269, at *5 (S.D.N.Y. Apr. 5, 2019) (Castel, J.) ("Generally, a showing of irreparable injury is the single most important prerequisite for the issuance of a preliminary injunction.") (citing *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).

The TRO should be dissolved because Schiff has not shown—indeed, he barely attempts to show—any irreparable harm *to himself*. *See* Fed. R. Civ. P. 65(b)(1)(A) (requiring a specific, clear showing "that immediate and irreparable injury, loss, or damage will result ***to the movant***"). While Schiff is the sole shareholder of EPB, he did not bring this proceeding in EPB's name, nor could he have done so because (as discussed above), only the Trustee may act for EPB. *See* Ex. C (Liquidation Plan) at 5 ("EPB ceased operations on June 30th, 2022, and the Trustee *took*

11

*possession of [EPB]*. [EPB] ceased conducting any business activity, except for the purposes of winding up its business affairs . . . *through the appointed Trustee.*"); Ex. K ("It is essential to emphasize that EPB is not an ongoing bank but rather an entity currently in liquidation under regulatory supervision.").

In his affirmation, Schiff claimed that *if* the *Trustee* "fails to act" and *if* "customers suffer losses as a result," then Schiff "*may* face personal liability" – but only up to the "amount of [Schiff's] paid-in capital, which has been substantially depleted." Schiff Aff.[3] ¶ 30 & n.2. Even apart from the fact that Schiff appears to expressly admit that he is not meaningfully at risk, and even proceeding on the dubious assumption that merely to be sued one day constitutes "irreparable injury," Schiff supplies no evidence that any of the events in the hypothetical chain of causation culminating in a lawsuit against him is happening or likely to happen. He merely speculates that *if* they do, he could be personally liable. But Schiff was required to demonstrate clearly an "injury that is neither remote nor speculative." *Forest City Daly Housing, Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999).

Schiff separately claims that because he is allegedly "the public face of EPB" he will suffer reputational harm that could "negatively impact [his] other ventures" and his "personal reputation" *if* EPB customers suffer "significant losses." Schiff Aff. ¶ 31. This, too, misses the mark. First, Schiff has not demonstrated that any such "significant losses" are likely to occur or are imminent. But the harm about which Schiff is complaining – its theoretical nature aside – is to other businesses of Schiff's. "[I]njuries to third parties do not demonstrate that [Schiff him]self will suffer irreparable harm." *Expedia*, 2019 WL 1499269, at *6. In all events, "conclusory statements

---

[3] Schiff's affirmation (without its exhibits) is submitted as Exhibit 5 to the De Jong Declaration and was also docketed at Dkt. 1-1 at 12-24.

of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *UGX Brands, LLC v. City of Norfolk*, 2025 WL 2083797, at *3 (S.D.N.Y. July 24, 2025).[4] Schiff's failure to establish irreparable harm to himself is dispositive, and on its own warrants dissolution of the TRO.

None of the other "harm" discussed in Schiff's state-court papers is even arguably harm to *Schiff*, but regardless, his allegations fall woefully short of the clear showing necessary to obtain an *ex parte* TRO or an injunction. Specifically, Schiff's petition and memorandum allege, each in a conclusory paragraph, that "[a]bsent injunctive relief, Respondents will likely dissipate or improperly encumber the assets, rendering any arbitral award ineffectual" and that "[t]he ongoing operational failures and financial instability of Respondents . . . further heighten the risk of irreparable harm." Dkt. 1-1 at 3 (Petition); *see also* Dkt. 1-1 at 30 (Memorandum).

His own affirmation, *i.e.*, the evidence that must support these vague allegations, offers only a small handful of speculative and conclusory assertions that Respondents are in financial trouble or that they will dissipate assets. Schiff Aff. ¶¶ 22-27. These allegations, as detailed in the accompanying De Jong Declaration, are false, misleading, irrelevant, or some combination of the three, and mostly amount to trivial gripes about web sites and second-guessing actions and decisions the Trustee and Qenta have taken and made in an attempt to promote the migration process. *See* De Jong Decl. ¶¶ 23-33.

Schiff makes much of the purported insolvency of *one affiliate* of Respondents – not Respondents themselves – and to unrelated state-court litigation brought by an entity named Offshore Exploration and Production LLC ("OEP") against Respondents' *parent*, De Jong Capital,

---

[4] There is no small irony in Schiff, who mismanaged EPB to such a degree that OCIF forced him to shut it down and liquidate it, complaining that the manner in which EPB is being liquidated is causing him reputational harm.

LLC ("DJC") (the "OEP Litigation"). Schiff Aff. ¶¶ 26, 27. But the affiliate was not insolvent and its winding down for unrelated reasons is irrelevant. De Jong Decl. ¶ 33. And in the OEP Litigation, which is currently in summary judgment briefing, most of OEP's claims were wiped away at the motion to dismiss stage, and OEP's maximum compensatory damages award is now a mere $71,503. Walfish Decl. ¶¶ 21-23. This litigation, in which DJC denies all liability (*id*. ¶ 22), does not begin to threaten DJC's financial condition, let alone that of Respondents. De Jong Decl. ¶ 34.

None of Schiff's allegations begin to "clearly show[], with specific facts, that there is an imminent danger that dissipation . . . is occurring or will occur." *Oscar Produce Inc. v. Jucedaro LLC*, 2025 WL 358932, at *1 (E.D.N.Y. Jan. 31, 2025) (denying *ex parte* TRO); *accord D'Arrigo Bros Co. of N.Y., Inc. v. Gramercy Produce Inc.*, 2024 WL 3329787, at *1 (S.D.N.Y. June 26, 2024) (same).

### B.  The TRO Suffers From Additional Fatal Flaws Requiring Its Dissolution

Although Schiff's failure to establish an immediate, irreparable, non-speculative injury is fatal to his TRO application, we note that the State Court's *ex parte* order is improper for several additional reasons. *First*, contrary to Rules 65(b)(1)(A) and 65(b)(2), State Court issued a TRO in the absence of "specific facts in an affidavit or a verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant *before the adverse party can be heard in opposition*."[5] Nothing in the TRO or Petitioner's papers submitted in support of it addresses the question of whether *giving notice* to Respondents would result in prejudice, nor does the TRO "describe the injury and state why it is irreparable," Rule 65(b)(2).

---

[5] Similar to the Federal Rules, the Rules of the Commercial Division of the Supreme Court, 22 N.Y.C.R.R. § 202.70 ("Commercial Division Rules") bar the issuance of a TRO in the absence of a demonstration of "significant prejudice by reason of giving notice." Rule 20 of the Commercial Division Rules.

The TRO itself is also impermissibly vague. A TRO must "describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required." Fed. R. Civ. P. 65(d). Although this requirement may not be spelled out explicitly in the CPLR, it is a requirement that this Court must enforce now that the action has been removed here, as any contempt proceeding for violation of the TRO would necessarily proceed in this Court, and an impermissibly vague TRO cannot support a contempt proceeding. *See N.Y. State Nat'l Org. for Women v. Ter*ry, 697 F. Supp. 1324, 1330-31 (S.D.N.Y. 1988).

Here, the State Court's order does not identify which "Assets" are restrained. Instead, it uses a defined term, presumably from the Agreement, and *other* defined terms, requiring an assumption (that the TRO is cross-referencing the Agreement) and, assuming that is correct, resort to another document for the terms of the restraint.  This is contrary to law. *See, e.g.*, *Petrello v. White,* 533 F.3d 110, 115-16 (2d Cir. 2008); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 146 (2d Cir. 2011).

The State Court did not even *consider* requiring Schiff to post an undertaking / security as it simultaneously restrained Respondents from taking any action with respect to more than $50 million worth of assets. Ex. E (TRO) at 2 (striking Schiff's offer to post an undertaking). *See Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (vacating injunction; "the district court did not adhere to the requirements of Rule 65(c)" by dispensing with the requirement of security without analyzing whether security was required). *Cf.* CPLR § 6313(c) (provision to require undertaking before imposing TRO); Fed. R. Civ. P. 65(c) (same).

State Court did not entertain any of these questions and Schiff made no attempt to satisfy these standards or the standards governing the issuance of *ex parte* temporary restraining orders under New York law.

## II.    SCHIFF'S REQUEST FOR AN INJUNCTION IN AID OF ARBITRATION SHOULD BE DENIED AND THIS PROCEEDING SHOULD BE DISMISSED

This is a special proceeding, brought under Article 75 of New York's Civil Procedure Law and Rules ("CPLR") for a preliminary injunction in aid of arbitration. CPLR § 7502(c). Specifically, Schiff asserted that he "intend[ed] to file a Notice of Arbitration contemporaneously with or shortly after this motion." Schiff Aff. ¶ 35; *see also* Ex. 1 (PAA) § 8.7. Schiff meanwhile seeks an order "enjoining Respondents from selling, transferring, encumbering, or disposing of any EPB assets pending arbitration, and prohibiting Respondents from destroying, concealing, or altering any documents or records related to the assets." Petition (Dkt. 1-1 at 4) ¶ 8.

To obtain this relief, Schiff is required to make a showing of (i) entitlement to injunctive relief under Article 63 of the CPLR, *i.e.*, to satisfy "the traditional standards governing preliminary injunctive relief" *and also, separately,* (ii) CPLR § 7502's requirement that a prospective arbitral award "may be rendered ineffectual without such provisional relief." CPLR § 7502(c). *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 84 (2d Cir. 2000) (injunction in aid of arbitration may be "granted only if those [traditional] standards [for the issuance of injunctive relief] *and* the 'rendered ineffectual' test are met.").

Schiff has not demonstrated any of the prerequisites to injunctive relief, or that an arbitral award would be rendered ineffectual in the absence of preliminary relief. A preliminary injunction of any kind "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). Schiff's application is short of the mark in every respect and the Petition should accordingly be dismissed.

### A.      Schiff Cannot Establish Irreparable Harm in the Absence of An Injunction

Schiff cannot establish irreparable harm in the absence of an injunction for the same reasons he cannot establish such harm in connection with the TRO.[6] For the reasons discussed above (§ I.A.), Schiff has not established any harm *at all* in the absence of an injunction. Not to him, personally, not to what remains of EPB, and not to its customers. There is nothing other than speculation that Respondents have, or will imminently, dissipate assets. The insufficiency of Schiff's claimed harm, on its own, warrants dismissal of the Petition. *See* § I.A., *supra*, and cases cited therein.

### B.      Schiff is Not Likely To Succeed on the Merits of His Arbitration Claims

"To establish probability of success on the merits" for CPLR § 7502(a) purposes, Schiff "must demonstrate that [he] more likely than not will succeed on any one of [his] claims. Often that requires more factual substantiation than would be sufficient for a pleading." *Discover Growth Fund v. 6D Glob. Techs. Inc.*, 2015 WL 6619971, at *4 (S.D.N.Y. Oct. 30, 2015) (Castel, J.). Schiff barely attempts to satisfy this standard—indeed he only vaguely describes the claims he intends to bring in arbitration. *See* Dkt. 1-1 (Petition) at 3 ¶ 5.

In Schiff's eventual two-page "Request for Arbitration" – not a traditional Statement of Claim or arbitral demand with factual allegations, but a terse letter to the International Chamber of Commerce (Ex. D) – he explains that he intends to ask that assets be returned to the Trustee, for an accounting, and damages for unjust enrichment and breach of the PAA. *Id.* at 2. In his Petition and accompanying papers, Schiff asserts that Respondents are not abiding by the terms of the PAA and similarly asks that the assets of "opt-in" customers be returned to the Trustee. Schiff Aff. ¶ 11;

---

[6] *See, e.g.*, *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs. for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723 (S.D.N.Y. 2019) (denying motion for temporary restraining order and preliminary injunction; analyzing claim of irreparable harm under the same standard).

Ex. 4. His unjust enrichment claim is based on the allegation that Respondents will benefit from the appreciation of precious metals prices in the time since EPB entered liquidation and the present. *Id.* ¶¶ 9, 24.

The gist of Schiff's complaint is that, although he acknowledges the authority of the Trustee over EPB's assets and the Trustee's ongoing negotiations with Respondents (*id.* ¶¶ 12-21), he does not approve of how the actual parties to those negotiations are handling them and wishes to intercede "out of solemn duty to protect the interests of EPB's customers and creditors, preserve the assets, and uphold the integrity of the receivership process." *Id.* ¶ 38.

Schiff's problem, which he nowhere addresses, is that the "solemn duty" he professes was divested from him by operation of law by OCIF, with his full assent and cooperation. *E.g.*, Ex. B at 13. Since that time, Schiff lacks all authority to act on EPB's behalf respecting the entity's wind-down and liquidation. That is the province of the Trustee (Exs. B-C), as even Schiff acknowledges. *E.g.*, Schiff Aff. ¶ 23 ("Although I offered to pay the fees personally, I lacked the necessary authorization to do so."). And as Schiff knows, Respondents and the Trustee *are in fact* working through issues concerning the "opt-in" customers. *Id.* ¶¶ 16-19; De Jong Decl. ¶ 21.

The Trustee has repeatedly taken the position that assets should *not* be returned to him. Ex. 3; Ex. K. Yet Schiff intends to ask on behalf of an institution he does not control—over whose assets he was forced to cede control—that an arbitral panel do the opposite of what the Trustee asks. Inasmuch as the Trustee, and the Trustee alone, has the authority to liquidate EPB's assets and implement the transfer of those assets to Respondents, Schiff does not have a claim that he can bring either on behalf of EPB or in his own name against Respondents relating to the disposition of assets that are the subject of the PAA.

Furthermore, if there is an unjust enrichment – and there is not – that, too is a matter between Respondents and the "opt-in" customers and the Trustee. Schiff has no standing to ask for an accounting, either. The assets of EPB are the Trustee's to liquidate, *not* Schiff's. It is no answer for Schiff to boast that he is "uniquely positioned to resolve this matter effectively," Schiff Aff. ¶ 15. Schiff *has no claims*, far less claims as to which he is more likely than not to prevail at arbitration. *See, e.g.*, *Hill v. Reynolds*, 187 A.D.2d 299, 300 (1st Dep't 1992) ("Supreme Court erred in granting the preliminary injunction [pursuant to CPLR § 7502(c)] since the Union had no standing to contest the alleged harm that would be caused by layoffs to the University, the University community or the students. The claim is not one in which the Union had a specific right. In the absence of this 'injury in fact', the Supreme Court was precluded from adjudicating this claim.").

## C.    The Balance of Equities Does Not Favor Schiff

In the unlikely event the Court determines that Schiff has clearly shown he will suffer irreparable harm in the absence of an injunction, the requested injunction should be denied for the separate reason that the balance of equities here tips decidedly in favor of Respondents. *See, e.g.*, *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 609 (S.D.N.Y. 2014). If Schiff's application is granted, Respondents will be prohibited from working with the Trustee— the only lawful representative of EPB entitled to direct EPB's liquidation—to effectuate resolution of the claims of "opt-in" customers. De Jong Decl. ¶ 22. The injunction Schiff requests is also in service of relief that the Trustee has not requested and has made repeatedly clear he does not want. *Id.* ¶¶ 17, 20; Ex. 3; Ex. K.

Schiff, by contrast, has claimed vaguely and implausibly that his *other businesses* will suffer reputational harm and he *might, someday* be subject to personal liability *if* the Trustee is sued by disgruntled EPB customers. In this regard, we emphasize that Schiff's ability to claim by

and through EPB respecting the assets of EPB without the express imprimatur of the Trustee was terminated in 2022. There is *no* harm to Schiff here, whereas an injunction would severely impede Respondents' abilities to effectuate agreeable transactions with the opt-in customers and with EPB's sole legitimate representative, the Trustee.

**D.     Schiff Has Not Satisfied CPLR § 7502(c)'s Required Showing that an Arbitral Award Would Be Rendered Ineffectual in the Absence of an Injunction**

In addition to the foregoing, an injunction may not issue here unless Schiff *also* satisfies CPLR § 7502(c)'s mandate than in the absence of relief, a prospective arbitral award would be rendered "ineffectual." *Messih*, 224 F.3d at 83. Schiff's entire argument on this score rests on his speculative assertions that Respondents are dissipating assets. Dkt. 1-1 at 30 (Memorandum). CPLR § 7502(c) is *not* satisfied where "plaintiff fails to show that defendants' assets may be dissipated prior to the issuance of an arbitral award." *Shubin v. Slate Digital, Inc.*, 2022 WL 168152, at *5 (S.D.N.Y. Jan. 19, 2022). Schiff has not made this showing and for this separate reason, the Petition should be dismissed.

## CONCLUSION

For the reasons discussed above, the TRO should be dissolved, Schiff's application for an injunction in aid of arbitration should be denied, and this proceeding should be dismissed.

Dated:  New York, New York
        August 12, 2025

                            KATSKY KORINS LLP


                            By:  _____/s/ Daniel Walfish_____
                                    Daniel Walfish
                                    (dwalfish@katskykorins.com)
                                    Elan R. Dobbs
                                    (edobbs@katskykorins.com)
                            605 Third Avenue
                            New York, New York 10158
                            Tel.: 212-953-6000


                            *Attorneys for Respondents Qenta Inc., Responsible*
                            *Gold Trading DMCC, and G-Commerce DMCC*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 7.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, I hereby certify that this memorandum of law contains 6,421 words, excluding the parts of the memorandum exempted by the rule. This certification is based on the word count function of the word processing system used to prepare this memorandum.


Daniel Walfish