# Holland & Knight

787 Seventh Avenue | New York, New York 10019 | T +1.212.513.3200 | F +1.212.385.9010
Holland & Knight LLP | www.hklaw.com

Elliot A. Magruder
+1 212-513-3238
elliot.magruder@hklaw.com

August 12, 2025

*Via ECF*

Hon. P. Kevin Castel
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
New York, New York 10007

      Re:    *Schiff v. Qenta Inc., et al.*, No. 1:25-cv-06426-PKC (S.D.N.Y.)
                Response to Respondents' Pre-Motion Letter (ECF Nos. 6, 7)

Dear Judge Castel:

      Holland & Knight LLP represents Petitioner Peter Schiff ("Petitioner"), who is the sole shareholder and chairman of Euro Pacific International Bank, Inc. ("EPB"). This letter responds to Respondents' Qenta Inc. ("Qenta"), Responsible Gold Trading DMCC, and G-Commerce DMCC's (collectively, "Respondents") pre-motion letter of August 6, 2025, and the Court's further Memorandum Endorsement. (ECF Nos. 6, 7.)[1]

      This Court should preserve the status quo pending further proceedings, by leaving in place the temporary restraining order ("TRO"), entered August 1, 2025 by the Westchester County Supreme Court. (ECF No. 1-1 at 172–73.[2]) The TRO was validly and properly entered—with notice to Respondents of the underlying action—in aid of an arbitration proceeding in which Petitioner seeks to recover millions of dollars of unique assets from Respondents on behalf of EPB. Those unique assets were the subject of an agreement that the Respondents themselves have purported to terminate, yet Respondents have refused to take the obvious and logical step of simply returning the assets to EPB.

      The dispute between the parties is significant, and deserves full and fair consideration. Nor do Respondents point to any reason that would require this Court to immediately take the drastic

---

[1] Petitioner is also in the process of reviewing Respondents' improvident Emergency Motion for an Order to Show Cause filed at ECF No. 12, which, among other things, is an attempt to preempt the arguments raised in this letter (despite the Court granting Petitioners until today to file it) and does not comply with the "good and sufficient" reasons standard for hearing orders to show cause set forth in Local Civil Rule 6.1(d). Petitioner will submit an initial response to this submission as soon as practicable.

[2] *Schiff v. Qenta, Inc., et al.*, Index No. 67774/2025 (Sup. Ct. Westchester Cnty.).

Atlanta | Austin | Birmingham | Boston | Century City | Charlotte | Chattanooga | Chicago | Dallas | Denver | Fort Lauderdale
Houston | Jacksonville | Los Angeles | Miami | Nashville | Newport Beach | New York | Orlando | Philadelphia
Portland | Richmond | San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

Algiers | Bogotá | London | Mexico City | Monterrey

step of dissolving the TRO, which was previously scheduled in the state court for a prompt show cause hearing on August 6, 2025, during which Respondents could have appeared and presented their arguments. Petitioner's counsel can be available for a conference this week at the Court's convenience to discuss these issues and to set a reasonable schedule for any further proceedings in this Court under 28 U.S.C. § 1450 and Fed. R. Civ. P. 65.

I.  **Factual and Procedural Background**

This dispute arises from liquidation proceedings of EPB, which have been pending in Puerto Rico since September 2022 (the "EPB Liquidation"). EPB was a financial institution which provided various services, including holding accounts for precious metals such as gold and silver. The EPB Liquidation is overseen by a trustee (the "Trustee"), but Petitioner remains to this day the sole shareholder of EPB with the power to act on behalf of EPB. The September 1, 2022 liquidation plan (the "Liquidation Plan") approved by the Trustee and by the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF") contemplates that EPB's liquidation would occur in coordination with the Trustee and OCIF, but did not vest sole authority in the Trustee to act on EPB's behalf. (ECF No. 1-1 at 113.) The Liquidation Plan also calls for Petitioner to indemnify the Trustee in connection with the winding up of EPB. (*Id.* at 119.)

Shortly after the EPB Liquidation began, Petitioner and EPB, on one hand, and Respondents, on the other hand entered into a Purchase and Assumption Agreement, dated September 30, 2022 (the "PAA"). (ECF No. 1-1 at 47–62.) Broadly speaking, the purpose of the PAA was to transfer certain unique assets (including precious metals such as gold and silver) and liabilities of EPB to Qenta in an effort to facilitate the orderly administration of the EPB Liquidation, and to allow EPB's customers the choice to continue their accounts, rather than to seek to recover their value in the liquidation.[3] (*Id.* at 13.) Petitioner signed the PAA on behalf of EPB, and is also himself a party to the PAA. The Trustee did not sign the PAA. In fact, the Trustee acknowledges the validity of the PAA and does not assert EPB and Petitioner lacked authority to enter into it. (*See id.* at 66–68.) The PAA is governed by New York law and includes an agreement to arbitrate disputes under International Chamber of Commerce ("ICC") Rules. Both the ICC rules and the PAA itself allow the parties to seek injunctive relief. (*See* ECF No. 1-1 at 58 (PAA § 8.7).)

Under the PAA, Qenta took custody of significant assets corresponding to the accounts of certain EPB customers (known as "opt-in" customers), including millions of dollars of precious metals (including gold and silver). Since taking custody of the assets from the "opt-in" customers, Qenta appears to have mismanaged a significant portion of those assets, including the precious metals. For example, since February 2024, Qenta has not paid the storage fees for approximately $10 million in silver owed by EPB customers. (*See* ECF No. 1-1 at 18.) In addition, Petitioner understands that Qenta engaged in an unauthorized conversion of the EPB customers' gold into "paper gold" without legal title. (*See id.*) G-Commerce DMCC (a Respondent in this case) designated to handle customer onboarding is presently winding down (*See id.*) The risk of

---

[3] EPB was fully solvent, meaning that all customers' accounts were backed by sufficient assets. (*See* ECF No. 1-1 at 38 (noting that EPB held approximately $68.1 million of assets—including precious metals—against $66.7 million of customer deposits). The option to continue with accounts that would be administered by Qenta going forward, rather than immediate liquidation, was accordingly an attractive option to many customers.

Hon. P. Kevin Castel
August 12, 2025
Page 3

dissipation of assets that should rightly simply be returned to EPB is accordingly very high. Similarly, the risk to EPB customers of being left with unsecured claims against Qenta in any potential insolvency proceeding is high.

On July 11, 2025, Qenta issued a "Notice of Termination" to the Trustee purporting to terminate the PAA on the ground that the regulatory approvals necessary for closing had not been obtained. (ECF No. 1-1 at 64-68.) Rather than simply return the EPB customer assets over which it had been given custody (but not ownership), Qenta proposed to "liquidate" the assets, and pay to the Trustee the value of the assets—including the precious metals—calculated as of September 2022 (*Id.* at 66.)[4] However, the value of the precious metal today is far higher than it was in 2022—approximately $25 million higher. Qenta's proposed actions would accordingly result in an enormous windfall—not to EPB or its customers—but to Qenta. Indeed, Petitioner is informed and believes that Qenta is currently attempting to negotiate deals with individual customers that would result in payments amounting to fraction of the value of their accounts, while shielding its dealings with these customers from scrutiny behind strict NDAs. To be clear: there is not a single clause in the PAA, nor any principle of equity, that supports Qenta's attempted actions here, which would amount to a lawless taking of assets from EPB and the opt-in customers.

In addition to unlawfully expropriating customers' gains for itself, Qenta also demanded to withhold from EPB over $5 million for unsubstantiated losses it claimed to have suffered over the past three years trying to close the transactions contemplated by the PAA. (*See* ECF No. 1-1 at 68) (including "Termination Costs" of approximately $5 million in appendix to July 11, 2025 "Notice of Termination".) However, the PAA clearly establishes that all parties would bear their own costs, not that EPB would be responsible for unsubstantiated costs purportedly associated with Qenta's custody (but not ownership) of certain assets subject to the PAA. (*See id.* at 1-1 at 58) (PAA § 8.11.) In the unlikely event that Qenta can substantiate those loss and prove they resulted from EPB's breach of the PAA, the proper forum to advance such a claim is in the Arbitration, as Petitioner has as the sole shareholder of EPB. Simply put, Qenta cannot be allowed to confiscate the assets of the EPB opt-in customers, whose claims are senior to Qenta.

Petitioner, as the sole shareholder of EPB and as a signatory to the PAA, accordingly commenced an arbitration in New York under the PAA to compel Respondents to return the EPB customer assets, to obtain an accounting, and to recover for unjust enrichment, breach of contract, and related harms. (ECF No. 1-1 at 138.) To prevent dissipation of those very assets—which would render any award in Petitioners' favor in the arbitration ineffectual—on July 29, 2025, Petitioner also filed the state court action seeking an injunction in aid of the arbitration. (ECF No. 1-1 at 11–14 (Verified Petition.))

The next day, July 30, 2025, counsel in the state court action provided notice of the request for injunctive relief by email to Respondents and to their present counsel. (*See* ECF No. 1-1 at 135-36) (Supplemental Affirmation of Notice.) This counsel then contacted the state court on July 31, 2025 to request scheduling consideration, but did not request *ex parte* entry of the TRO. (*Id.*

---

[4] The Trustee objected strongly to the proposal on the ground that customer assets should not be liquidated without individualized direction from each customer, and further noted that Qenta's stated intention to "cancel" subsidiaries once owned by EPB was "not only unwarranted[,] but most likely illegal." (ECF No. 1-1 at 86.)

Hon. P. Kevin Castel
August 12, 2025
Page 4

at 137.)  Rather, this counsel asked only that the hearing on Petitioner's filing occur prior to August 8, 2025.  (*See id.*)  The state court then signed the TRO on August 1, 2025, setting a show cause hearing for August 6, 2025. (*Id.* at 172–73.)  Respondents then removed the case to this Court before the show cause hearing occurred.

### II. The Court Should Not Vacate the TRO, but Should Set a Reasonable Briefing Schedule or Set a Hearing

The parties' underlying dispute involves a bevy of factual and legal issues (including issues of Puerto Rican law).  These issues can and should be resolved in arbitration pursuant to the PAA.  Two points, however, are clear—first, Qenta's failure to return EPB's assets after Qenta's own termination of the PAA is wrong and should be redressed. Second, if Respondents are permitted to dissipate these unique assets over which they have held sole custody for nearly three years, the arbitration proceedings are likely to be in vain.  This Court should not permit that to occur and certainly should not proceed on a summary basis without the benefit of briefing and argument.

After removal, injunctions entered by a state court "remain in full force and effect until dissolved or modified by the district court."  *See* 28 U.S.C. § 1450.  Here, the Westchester County court entered an injunction in aid of arbitration proceedings before the ICC, pending a further show cause hearing.  (*See* ECF No. 1-1 at 67 (PAA § 8.7.))  The ICC rules expressly allow parties to "apply to any competent judicial authority for interim or conservatory measures."  ICC 2021 Arbitration Rules, Art. 28.[5]  Under Supreme Court precedent, the outcome should be the same here, now that federal rules apply.  *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 438 (1974).

Federal courts have long recognized their authority to issue preliminary injunctions to preserve the status quo pending arbitration.  *See, e.g.*, *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894–95 (2d Cir. 2015).  The same standard applies for pre-arbitration injunctions as for any preliminary injunction generally (*see id.*), which is (in all material parts) the same standard as the state court applied in granting the TRO here.  *See, e.g.*, *Nobu Next Door, LLC v. Fine Arts Hous., Inc.*, 4 N.Y.3d 839, 840 (2005) ("The party seeking a preliminary injunction must demonstrate a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of equities in its favor.").

The proper next step for the Court is to set a hearing and/or permit additional briefing on Petitioner's requested preliminary injunction, where Qenta will have an opportunity to present evidence and argument regarding this provisional remedy pending its proper and ultimate resolution in arbitration.  *See, e.g.*, Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2951 ("The [TRO] is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction. . . .") Respondents fail to provide any reason to immediately dissolve the TRO.

First, Petitioner has a strong likelihood of success on the merits on the claims alleged in

---

[5] *Available at* https://iccwbo.org/dispute-resolution/dispute-resolution-services/arbitration/rules-procedure/2021-arbitration-rules/#block-accordion-28.

the Arbitration, including for breach of the PAA and unjust enrichment. Qenta's own position is that the PAA never closed, yet it refuses to return the assets of Qenta's opt-in customers that would have passed to Qenta if the PAA had closed. Qenta instead proposes—entirely without justification either in the PAA or elsewhere—to mark those assets down to their previous value, retaining enormous appreciation solely for itself.[6] Qenta would be unjustly enriched if it were permitted to reap the benefits of the rise of the precious metals' value, particularly given that it appears to have flagrantly mismanaged the assets (which could have led to a <u>diminution</u> in value of the opt-in customers' assets).

Second, Petitioner is the sole shareholder of EPB and is a party to the PAA. Although EPB is currently involved in the EPB Liquidation governed by Puerto Rican law, Petitioner is expressly entitled to participate in the liquidation in cooperation with the Trustee. Indeed, Petitioner negotiated and entered into the PAA shortly after the EPB Liquidation as part of the Liquidation Plan. That Plan further requires Petitioner to indemnify the Trustee for claims that may be asserted in connection with the EPB Liquidation. (ECF No. 1-1 at 128.) Respondents' suggestion that Petitioner is not the appropriate party to seek to protect EPB's interests is accordingly unfounded. Indeed, the Trustee is not even a party to the PAA, which the Trustee has himself acknowledged. Since EPB clearly is a party to the PAA and Petitioner signed that agreement as chairman of EPB, he must be allowed to act on its behalf. At a minimum, the issue of the appropriate party presents a question turning on a detailed analysis of Puerto Rican law and the implications and proceedings in the EPB Liquidation. The point provides no basis for this Court to summarily dissolve the TRO as Respondents request.

Third, the TRO was not improvidently granted. Contrary to Respondents' contentions, the state court did not grant the TRO "without notice"—and thus New York's heightened requirements for *ex parte* TRO requests do not apply. *See* CPLR § 6313; 22 NYCRR 202.70(g) (Rule 20); *accord* 22 NYCRR §§ 202.7(f), 202.8-e.[7] Petitioner provided notice of the TRO request to Respondents and their counsel two days before the Supreme Court granted the TRO. (ECF No. 1-1 at 135.) Under the circumstances, this notice suffices. *See B.T. v. E.T.*, 37 N.Y.S.3d 844, 845 (Sup. Ct. Richmond Cnty. 2016) (holding that providing notice of a TRO request by fax, and less than 24 hours before a ruling, was sufficient under the circumstances of the case). Respondents also claim that the TRO petition was defective because Petitioner failed to comply with New York's requirement that a notice of petition be served "in the same manner as a summons." CPLR § 403(c). Respondents fail to acknowledge that CPLR § 403 *alternatively* provides that a petitioner may serve the petition as ordered in an order to show cause "in lieu of a notice of petition," *id.* § 403(d), which is precisely what occurred here. (ECF No. 1-1 at 173 (providing service instructions.)) Respondents cannot deny that they were on notice regarding the provisional relief that Petitioner seeks, and Petitioner has no objection to this Court providing Respondents with an

---

[6] This sleight of hand, in addition to being patently improper, contradicts prior statements by Qenta that it would, among other things, "honor" the opt-in customers' "current portfolio as it stands." (ECF No. 1-1 at 112.)

[7] Even if the Court considers the TRO to have been entered *ex parte*, Petitioner can demonstrate the "significant prejudice" required to obtain a TRO *ex parte*. *See* 22 NYCRR 202.70(g) (Rule 20). Absent the TRO, Qenta would be free to keep for itself the appreciation in value of the precious metals, despite no contractual or other legal basis to do so. Should that have occurred, EPB's opt-in customers would have been robbed of significant value and Petitioner would suffer significant prejudice.

Hon. P. Kevin Castel
August 12, 2025
Page 6

opportunity for appropriate argument and evidence as the state court was prepared to do.

Nor did the state court fail to consider Petitioner's showing of irreparable harm. Petitioner has provided a detailed explanation of the financial and reputational harm (including the potential for indemnification of the Trustee) if Respondents dissipate these unique precious metal assets, with little prospect of compensation for those losses from a group of entities that have increasingly moved towards insolvency. (*See* ECF No. 1-1 at 17–19, 21.)

Finally, Respondents point to no reason they must immediately dispose of assets that have now been in their custody for years—thereby *altering* the current status quo pending arbitration. Although they contend they wish to marshal assets for the benefit of EPB's customers, in reality they seek to retain the appreciation of those assets for themselves at the expense of EPB and its customers, and likely extract other egregious and unauthorized concessions, while shielding the process of the improper liquidation of the assets through restrictive NDAs.[8] The equities of this case strongly favor Petitioner, and do not justify vacating the TRO.

For these reasons, Petitioner respectfully requests that the Court decline to dissolve or modify the TRO, and withhold any decision until the parties can fairly present their positions on the issues described above. We are available to discuss these issues at a time convenient to the Court, and we thank the Court for its attention to this matter.

Respectfully submitted,

/s/ *Elliot A. Magruder*

*Counsel for Petitioner Peter Schiff*

cc: All Counsel of Record

---

[8] Equally unavailing is Respondents' contention that the TRO is impermissibly vague. The unique EPB assets in question are well understood by the parties, and are clear on the face of the TRO.

#525841713_v1